DONALD E. MISENHEIMER, EXECUTOR UNDER WILL OF ISAM R. MISEN-
HEIMER v. JOHN E. MISENHEIMER; CAROLYN M. PRINCE; DONALD E.
MISENHEIMER; THOMAS M. MISENHEIMER; SYLVIA M. GRUENDLER;
SHARON M. MISENHEIMER; KENNETH R. MISENHEIMER; JOHN E.
MISENHEIMER, JR.; AND SAMUEL MISENHEIMER, MINOR

No. 368PA83

(Filed 30 January 1985)

**Descent and Distribution § 6; Wills § 66.1 — decedent murdered by son — residuary
estate — slayer and anti-lapse statutes — right of slayer's children to take
slayer's residuary share**

> Where decedent was murdered by one of his sons, decedent's will left his
> residuary estate to his eight surviving children, including the slayer, in equal
> shares, and decedent did not indicate any intent that a lapsed share would
> pass other than through the will's residuary clause, the slayer's share in dece-
> dent's estate was "otherwise disposed of by the will" within the meaning of
> the slayer statute, G.S. 31A-4(3), and since the slayer is conclusively presumed
> to have predeceased decedent for purposes of distribution of property under
> the will, section (a) of the anti-lapse statute, G.S. 31-42, applies so that the
> slayer's two children take the slayer's entire one-eighth interest in the
> residuary estate by substitution.

> Justice VAUGHN did not participate in the consideration or decision of this
> case.

> Justice EXUM dissenting.

> Justice MEYER joins in this dissenting opinion.

ON discretionary review of the decision of the Court of Ap-
peals, 62 N.C. App. 706, 303 S.E. 2d 415 (1983), affirming judgment
entered by *Grist, J.*, at the 26 April 1982 session of Superior
Court, MECKLENBURG County. Heard in the Supreme Court 10
April 1984.

*Henderson & Shuford, by Robert E. Henderson, for plaintiff
appellant.*

*Jo Hill Dobbins for defendant appellees.*

MARTIN, Justice.

Isam R. Misenheimer was murdered by his son John.[1] After
providing for payment of his debts, funeral and other expenses,

---

1. *See State v. Misenheimer*, 304 N.C. 108, 282 S.E. 2d 791 (1981) (affirming
John's first degree murder conviction for which he received a life sentence).

Isam's will left his residuary estate to his eight surviving children, including John, in equal shares. John has two sons. The question presented by this action for a declaratory judgment is how to distribute John's share in light of the "slayer statute," article 3 of chapter 31A of the General Statutes of North Carolina, which bars one who "willfully and unlawfully" kills another as principal or accessory from sharing in the other's estate.

Articles I and II of Isam Misenheimer's will provide for the payment of debts, estate expenses, and taxes. Article IV appoints Isam's son Donald executor. Article V grants powers to the executor. The will's only remaining article, III, provides:

### DISPOSITION OF RESIDUE

I will, devise and bequeath all the residue and remainder of the property which I may own at the time of my death, real or personal, tangible and intangible, of whatsoever nature and wheresoever situated, including all property which I may acquire or become entitled to after the execution of this Will, and including any property over or concerning which I may have any power of appointment unto the following named persons absolutely and in fee simple, share and share alike:

1. Carolyn M. Prince
2. Johny E. Misenheimer
3. Donald E. Misenheimer
4. Thomas M. Misenheimer
5. James C. Misenheimer
6. Sylvia M. Misenheimer
7. Sharon M. Misenheimer
8. Kenneth R. Misenheimer

The testator was survived by all eight children named in Article III, including John. John's two children, John E. and Samuel, are appellees herein.

None of the parties to this appeal dispute that John murdered the testator and is a "slayer" within the meaning of N.C.G.S. 31A-3:

Definitions. As used in this Article, unless the context otherwise requires, the term—

Misenheimer v. Misenheimer

. . . .

(3) "Slayer" means
    a. Any person who by a court of competent jurisdiction shall have been convicted as a principal or accessory before the fact of the willful and unlawful killing of another person . . .

N.C.G.S. 31A-4 provides:

Slayer barred from testate or intestate succession and other rights. The slayer shall be deemed to have died immediately prior to the death of the decedent and the following rules shall apply:

. . . .

(3) Where the decedent dies testate as to property which would have passed to the slayer pursuant to the will, such property shall pass as if the decedent had died intestate with respect thereto, unless otherwise disposed of by the will.

The disagreements in the present case concern whether John's share is "otherwise disposed of by the will" as that phrase is used in the slayer statute and how N.C.G.S. 31-42, the anti-lapse statute, is to be applied.

The anti-lapse statute applies to all wills and provides means by which property is to be distributed in the event of "failure of devises and legacies by lapse or otherwise." In relevant part the statute provides:

§ 31-42. Failure of devises and legacies by lapse or otherwise; renunciation. (a) Devolution of Devise or Legacy to Person Predeceasing Testator.—Unless a contrary intent is indicated by the will, where a devise or legacy of any interest in property is given to a devisee or legatee who would have taken individually had he survived the testator, and he dies survived by issue before the testator, whether he dies before or after the making of the will, such devise or legacy shall pass by substitution to such issue of the devisee or legatee as survive the testator in all cases where such issue of the deceased devisee or legatee would have been an heir

of the testator under the provisions of the Intestate Succession Act had there been no will.

. . . .

(c) Devolution of void, revoked, or lapsed devises or legacies.—If subsections (a) and (b) above are not applicable and if a contrary intent is not indicated by the will:

> (1) Where a devise or legacy of any interest in property is void, is revoked, or lapses or which for any other reason fails to take effect, such a devise or legacy shall pass:
>
> > a. Under the residuary clause of the will applicable to real property in case of such devise, or applicable to personal property in case of such legacy, or
> >
> > b. As if the testator had died intestate with respect thereto when there is no such applicable residuary clause; and
>
> (2) Where a residuary devise or legacy is void, revoked, lapsed or for any other reason fails to take effect with respect to any devisee or legatee named in the residuary clause itself or a member of a class described therein, then such devise or legacy shall continue as a part of the residue and shall pass to the other residuary devisees or legatees if any; or, if none, shall pass as if the testator had died intestate with respect thereto.

The parties to the instant appeal take the following positions. Plaintiff executor argues: (1) By the manner in which the testator structured his residuary clause, he "otherwise disposed of" John's share, which is now void because of the slayer statute, so that John's share is to be divided equally among the other named residuary beneficiaries. (2) Alternatively, if the anti-lapse statute applies, then section (c)(2) of that statute controls so as to reach the same result. John's children argue: (1) John's share is "otherwise disposed of by the will" within the meaning of the slayer statute. (2) The share must pass under section (a) of the anti-lapse statute because under the slayer statute John is conclusively

presumed to have predeceased his father. (3) Therefore, John's two children take John's entire one-eighth interest in the residuary estate by substitution. The Court of Appeals essentially followed the reasoning urged by John's children and reached the result dictated by it.

We agree with the Court of Appeals and therefore hold that under the slayer and anti-lapse statutes John's two children are entitled to divide the entire one-eighth share of decedent's estate which their father would have inherited had he not killed the decedent. It is elementary that the primary object in interpreting a will is to give effect to the intention of the testator. *Wilson v. Church*, 284 N.C. 284, 200 S.E. 2d 769 (1973). It is a long-standing policy of the State of North Carolina to construe a will with the presumption that the testator did not intend to die intestate with respect to any part of his property. *Quickel v. Quickel*, 261 N.C. 696, 136 S.E. 2d 52 (1964). We hold that Isam Misenheimer's will "otherwise disposed of" the slayer's interest in the decedent's estate within the meaning of N.C.G.S. 31A-4(3). The residuary clause of the will states that decedent:

> will[s], devise[s] and bequeath[es] *all* the residue and remainder of the property which I may own at the time of my death . . . unto the following named persons *absolutely and in fee simple, share and share alike*:
>
> 1. Carolyn M. Prince
> 2. Johny E. Misenheimer
> 3. Donald E. Misenheimer
> 4. Thomas M. Misenheimer
> 5. James C. Misenheimer
> 6. Sylvia M. Misenheimer
> 7. Sharon M. Misenheimer
> 8. Kenneth R. Misenheimer

(Emphases added.) As this Court stated in *Howell v. Mehegan*, 174 N.C. 64, 67, 93 S.E. 438, 440 (1917), "no contrary intent appearing [in the will], a void or lapsed legacy or devise passes under a general residuary clause . . . ." Isam Misenheimer did not indicate any intent that a lapsed share would pass otherwise than through the will's residuary clause. To the contrary, his expressed intent is that all remaining property should pass under the residuary clause.

N.C.G.S. 31A-4(3) mandates that the slayer, John E. Misenheimer, is conclusively presumed to have predeceased the testator for purposes of distribution of property under the will. Thus his legacy from decedent fails and must be distributed through the residuary clause of decedent's will. To determine specifically how John's share is to be divided, we must turn to the statute governing the disposition of failed legacies under a residuary clause.

As we stated earlier, the anti-lapse statute, N.C.G.S. 31-42, applies to all wills and provides means by which property is to be distributed in the event of "failure of devises and legacies by lapse *or otherwise*." (Emphasis added.) It is presumed that a will is executed in contemplation of applicable statutes. *Trust Co. v. Drug Co.*, 217 N.C. 502, 8 S.E. 2d 593 (1940). Because of the failure of John's legacy, the property that would have gone to him under the will had he not been convicted of killing his father must be distributed in accord with N.C.G.S. 31-42(a). In the present case, as John's two children are alive and would have been heirs of Isam Misenheimer had he died intestate, John's failed legacy must pass by substitution to them in accordance with this statute. Because of the conclusive presumption in N.C.G.S. 31A-4(3) that the slayer predeceased the testator, N.C.G.S. 31-42(a), not N.C.G.S. 31-42(c)(2), applies. It was the intent of the General Assembly that the presumption in 31A-4(3) be equivalent to actual death for all purposes of determining the disposition of property of the testator. *See* Special Report of the General Statutes Commission on an Act to be entitled "Acts Barring Property Rights" (1961).

If we were to hold that N.C.G.S. 31-42(c)(2) applies merely because the slayer does not, in fact, predecease the slain, we would be ignoring the legislative scheme intended by the statutory presumption of the slayer's death. Moreover, N.C.G.S. 31-42(c) expressly states that section (c) applies only if N.C.G.S. 31-42(a) is not applicable, thus making N.C.G.S. 31-42(a) the dominant or controlling statute.

Finally, were N.C.G.S. 31-42(c)(2) to apply, John's children would receive nothing under the testator's will, because this section of the statute provides that a lapsed devise or legacy "shall pass to the other residuary devisees or legatees." Surely, this is not what this testator or any slain testator would have intended

if he could have foreseen the means of his own demise. Any other holding would result in a much less equitable result as far as the innocent children of John are concerned. While it may be true that "the gods visit the sins of the fathers upon the children," Euripides, *Phrixus* (see also *Exodus* 20:5; Shakespeare, *Merchant of Venice* III v 1), this Court will not do so.[2]

---

2. Moreover, adoption of the argument of the dissent would render the slayer statute unconstitutional as applied. Long ago the common law required a felon convicted of a capital crime to forfeit all of his real and personal property to the Crown, and further provided that the attainted felon's heirs could inherit nothing from him because of his corrupt blood. 4 W. Blackstone, *Commentaries* *380-81. *See generally* Note, *Decedents' Estates—Forfeitures of Property Rights by Slayers*, 12 Wake Forest L. Rev. 448, 456 (1976).

However, these ancient common law doctrines were abolished in America under the Federal Constitution. Article I, section 10, clause 1 of the United States Constitution provides in pertinent part that "[n]o state shall . . . pass any bill of attainder . . . ." *See also* N.C. Const. art. I, § 19. In *Ex Parte Garland*, 71 U.S. 333, 18 L.Ed. 366 (1867), the United States Supreme Court noted that the enactment of a statute providing for corruption of the blood, *i.e.*, preventing a felon from receiving or transmitting property or other rights by inheritance, constitutes punishment for bill of attainder purposes. *See generally* Annot., 53 L.Ed. 2d 1273, 1287-88 (1978). Thus, any state law permitting corruption of the blood is an unconstitutional bill of attainder.

The interpretation of the slayer statute in the dissent would find that because of their father's corrupt blood John Misenheimer's children's inheritance from the testator is grossly reduced from the one-sixteenth share to which each is entitled under N.C.G.S. 31-42 to one one-hundred-twenty-eighth. This eight hundred percent reduction in their interest in decedent's estate is due solely, under the argument in the dissent, to the fact that their father killed their grandfather. It is thus due to nothing other than corruption of the blood. Such an interpretation of the slayer statute is unconstitutional as applied.

In *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323, 18 L.Ed. 356, 363 (1867), the Supreme Court of the United States said:

A bill of attainder is a legislative Act which inflicts punishment without a judicial trial.

If the punishment be less than death, the act is termed a bill of pains and penalties. Within the meaning of the Constitution, bills of attainder include bills of pains and penalties.

*Accord United States v. Lovett*, 328 U.S. 303, 90 L.Ed. 1252 (1946). It is not necessary that *all* of the children's rights in their grandfather's estate be destroyed. "The deprivation of *any* rights, civil or political, previously enjoyed, may be punishment . . . ." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 320, 18 L.Ed. 356, 362 (emphasis added). Under the dissenting opinion testator's grandchildren are being punished within the meaning of *Cummings*. Before their father killed Isam Misenheimer they had the right to inherit their father's share under Isam's

If John had died of natural causes before Isam, by reason of the terms of the residuary clause of the will and the anti-lapse statute John's two children would have taken the one-eighth share intended for John. By virtue of N.C.G.S. 31A-4, for the purposes of construing Isam's will John is legally deemed to have predeceased Isam. Therefore, the same disposition of Isam's property must follow under the residuary clause and the anti-lapse statute.

The decision of the Court of Appeals is

Affirmed.

Justice VAUGHN did not participate in the consideration or decision of this case.

Justice EXUM dissenting.

The majority strains to reach what it considers the preferable result that John Misenheimer's two children take his entire testamentary share, rather than the share which the slayer statute accords them. I, too, like this result. But I cannot get to it under the slayer statute. The majority's effort to do so has resulted in an opinion which is internally inconsistent, at odds with its own premises, and which, inexplicably, substitutes the provisions of the anti-lapse statute for those of the slayer statute. The opinion violates that well-established canon of statutory construction that when one of two different statutes might apply to the same situation, the statute which deals more directly and specifically with the situation must apply in preference to the statute of more general applicability. The majority opinion is also at odds with the intent of the General Assembly in enacting the slayer statute as that intent is so clearly expressed in the statute itself and its legislative history.

I am satisfied: (1) The anti-lapse statute has no application to the case. (2) John's share of the residuary estate passes "as if the decedent had died intestate with respect thereto" according to the terms of the slayer statute. (3) Therefore John's children each

---

will if the share lapsed. Under the dissenting opinion they have been deprived of this right solely because of their father's crime, rendering the slayer statute an unconstitutional bill of attainder.

take one-sixteenth and the testator's other seven children each take one-eighth of John's one-eighth share of the estate.

The majority's position seems to be that because the anti-lapse statute is deemed to be a part of every will (so, of course, is the slayer statute), this statute, thus included in Isam Misenheimer's will, has somehow "otherwise disposed of" (as that phrase is used in the slayer statute) John Misenheimer's share. More particularly, the majority says that the residuary clause in Isam Misenheimer's will together with the anti-lapse statute operate "to otherwise dispose of" John's legacy pursuant to subsection (a) of the anti-lapse statute.

This reasoning is patently specious. First, if the residuary clause controls disposition of John's legacy by way of the anti-lapse statute, it is subsection (c), not (a), of the statute that must be applied. Indeed, the majority *relies on* subsection (c), not (a), for the proposition that when a legacy fails "by lapse *or otherwise*," the anti-lapse statute applies. (Emphasis by majority.) The "or otherwise" language is, according to the majority, broad enough to include failure under the slayer statute. But subsection (c) of the anti-lapse statute passes lapsed bequests *under the residuary clause.* Only subsection (a) of the anti-lapse statute passes lapsed bequests to the issue of legatees whose bequests have lapsed. And subsection (a) takes effect only when the legatee "dies survived by issue before the testator." John Misenheimer did not die survived by the testator. If John's share is to pass under subsection (c) of the anti-lapse statute, as the majority's reasoning would seem to require, the other surviving residuary legatees would take all of John's share and John's children would take nothing. Indeed, the majority relies on *Howell v. Mehegan,* 174 N.C. 64, 67, 93 S.E. 438, 440 (1917), for the proposition that "no contrary intent appearing [in the will], a void or lapsed legacy or devise passes under a general residuary clause." It goes on to say that a specific legatee's lapsed share should pass under the residuary clause. If so, again John's share would all go to the other residuary legatees, not to his children.

Second, the majority, inexplicably, maintains that Isam Misenheimer's will somehow by implication "otherwise disposes of" John's legacy within the meaning of the slayer statute, yet the will has no such implied provisions to take the legacy out of

the operation of the anti-lapse statute. With respect to this will, both propositions cannot be true.

Both the slayer statute and the anti-lapse statute are deemed to be part of every will. This is the legal fiction by which the alternative disposition schemes of each statute take effect in the case of a slaying on the one hand or a lapsed bequest on the other. Neither statute, of course, applies to a will which itself by implication or otherwise provides for alternative disposition in the event a bequest cannot take effect as the testator desired. A will either makes alternative provision for disposition of a bequest that for some reason (either lapse or slaying of testator by legatee) cannot take effect as testator desired, or it does not make such a provision. A will should not be read to make by implication an alternative disposition under the slayer statute yet not make one under the anti-lapse statute unless the implications to this effect are considerably stronger than they are in Isam Misenheimer's will. Either the will controls, or the anti-lapse statute controls, or the slayer statute controls. But a will which by its terms is silent as to alternative disposition is no more effective to take a bequest out of the operation of the slayer statute than it is to take it out of the operation of the anti-lapse statute.

Suppose, for example, John Misenheimer had in fact predeceased the testator, leaving issue surviving. Under the majority's reasoning the anti-lapse statute would not operate because the will's residuary clause establishes the testator's intent to dispose of thereunder bequests which cannot otherwise take effect as the will provides. Therefore, the other named residuary legatees would take all of John's share.

The truth, of course, is that the will itself does not speak to the question of what happens to the bequest of a residuary legatee who predeceases the testator, leaving issue surviving. Therefore, had John in fact predeceased the testator with issue surviving, subsection (a) of the anti-lapse statute would apply. Neither does the will speak to the question of what happens should the bequest of a residuary legatee "otherwise" fail to take effect, e.g., because of the provisions of the slayer statute. In this situation this Court's duty, even if the result is not particularly to its liking, is to apply the alternative dispositive provisions of the slayer statute, which the legislature enacted to cover precisely

the situation before the Court. Indeed, the legislature could not have made its intention any clearer than when it provided in the slayer statute itself:

> As to all acts specifically provided for in this [statute], the rules, the remedies, and procedures herein specified shall be exclusive, and as to all acts not specifically provided for in this [statute], all rules, remedies, and procedures, if any, which now exist or hereinafter may exist either by virtue of statute, or by virtue of the inherent powers of any court of competent jurisdiction, or otherwise, shall be applicable.

N.C.G.S. § 31A-15.

Stated simply, when a will, such as Isam Misenheimer's, is silent on alternative dispositions, the slayer statute provides one in the event of a slaying; the anti-lapse statute provides one in the event of a lapse. Here we have a slaying, not a lapse. Therefore the alternative disposition of the slayer statute controls.

It must be emphasized that both the anti-lapse statute and the slayer statute are, in effect, intent-effectuating. The anti-lapse statute purports to dispose of property that would otherwise lapse in a manner which, in the legislature's view, would most likely accord with what most testators would have done had they considered the possibility of lapsed legacies. If, however, an intent contrary to the provisions of the statute "is indicated by the will," this intent shall prevail over the statute.

The slayer statute also provides its own alternative method of distribution. In this respect it resembles the anti-lapse statute. As stated in the Special Report of the General Statutes Commission which recommended the slayer statute to the General Assembly:

> This statute not only prevents the slayer from taking from the decedent as heir or devisee, but provides an alternative disposition. By its terms the slayer is deemed to have died immediately prior to the intestate or testator, and the slayer's share of the decedent's estate passes to 'others' next entitled to succeed by intestacy law, e.g. to the other heirs of the decedent, including the issue of the slayer in their own right by representation of their 'deceased' parent [*Bates v. Wilson*, 313 Ky. 592 (1950)], but not to one who can claim only

from the slayer, such as his spouse. [*Price v. Hitaffer*, 164 Md. 505 (1933)]. However, where the decedent leaves a will his other heirs take the slayer's devise or bequest only if it is not otherwise disposed by the will, e.g. to an alternative beneficiary or by way of residuary disposition.

Special Report of the General Statutes Commission on an Act to be entitled "Acts Barring Property Rights" pp. 13-14 (1961) (hereinafter referred to as Special Report). Professor Bolich, one of the drafters of the statute, commented similarly:

> [S]ubsections (2) and (3) specify what happens to property which would otherwise pass from the decedent to the slayer by testate or intestate succession. Intestate property goes to the other heirs of the decedent next in succession. Testate property passes to the decedent's heirs other than the slayer unless otherwise disposed of by the will—for example, to an alternative beneficiary or by way of residuary disposition to others than the slayer.

Bolich, *Acts Barring Property Rights*, 40 N.C. L. Rev. 175, 198 (1962).

Thus the slayer statute, like the anti-lapse statute, is designed to dispose of property that would otherwise have gone to the slayer in a manner which, in the legislature's view, would most likely accord with the testator's wish. If, however, the will otherwise disposes of the slayer's share, the will prevails.

The residuary clause in Isam Misenheimer's will, contrary to the majority's assertion, is not an alternative disposition of John's legacy. Except for provisions in Article I and II dealing with the payment of debts, expenses, and taxes, Article III is the will's only dispositive provision. There is no language, as the executor argues, suggesting that if one or more of the designated legatees for whatever reason does not or cannot take his or her share, then the other designated legatees shall take it. The will does not leave the residuary estate to the children of Isam Misenheimer jointly or as a class. Neither is there any language to indicate by implication or otherwise that a named beneficiary's heirs or issue should take in his place. The will itself, therefore, does not "otherwise dispose of" John Misenheimer's share either to the other named beneficiaries or to John's children.

The majority's holding in effect emasculates the alternative disposition scheme of the slayer statute. Under this holding the alternative disposition scheme of the anti-lapse statute rather than the alternative disposition scheme of the slayer statute will apply in all cases in which the testator has been slain by a legatee. This position is unsound for the following reasons.

Both the slayer statute and the anti-lapse statute have, as I have demonstrated, their own discrete dispositive schemes. Different dispositions of property could result if one of these statutes were applied as opposed to the other. The slayer statute treats the slayer as if he predeceased the testator but, in the absence of an alternative disposition in the will, provides that the slayer's share "shall pass as if the decedent had died intestate with respect thereto." The interest in the estate, if any, of those who take in lieu of the slayer is determined by their relation to the testator, not the slayer. Section (a) of the anti-lapse statute provides that "issue of a legatee who predeceases the testator substitute for the legatee and take what would have been the legatee's share if such issue survive and would have been heirs of the testator had testator died intestate." Thus under this section of the anti-lapse statute the interest in the estate, if any, of the issue of the predeceased legatee is determined by their relation to the predeceased legatee, not the testator.

Where one of two different statutes might apply to the same situation, the statute which deals more directly and specifically with the situation must take precedence over a statute of more general applicability. *Colonial Pipeline Co. v. Neill,* 296 N.C. 503, 251 S.E. 2d 457 (1979); *Seders v. Powell,* 298 N.C. 453, 259 S.E. 2d 544 (1979); *State Highway Commission v. Hemphill,* 269 N.C. 535, 153 S.E. 2d 22 (1967). Section (a) of the anti-lapse statute deals with the situation where a legatee in fact predeceases the testator. The remaining sections of this statute deal with other situations under which a legacy "is void, is revoked, is renounced, or lapses or which for any other reason fails to take effect. . . ." The slayer statute deals specifically and directly with the unusual situation in which one otherwise entitled to share in an estate has slain the decedent. Hence in these unusual cases the slayer statute's dispository scheme should control over that of the anti-lapse statute.

The legislative history of the slayer statute also supports the proposition that it controls to the exclusion of the anti-lapse statute in situations to which it applies. In commenting on this section when it was proposed to the General Assembly in 1961, the General Statutes Commission noted:

> This statute not only prevents the slayer from taking from the decedent as heir or devisee, but provides an alternative disposition. By its terms the slayer is deemed to have died immediately prior to the intestate or testator, and the slayer's share of the decedent's estate passes to 'others' next entitled to succeed by intestacy law, e.g. to the other heirs of the decedent, including issue of the slayer in their own right by representation of their 'deceased' parent but not to one who can claim only from the slayer, such as his spouse. However, where the decedent leaves a will his other heirs take the slayer's devise or bequest only if it is not otherwise disposed of by the will, e.g. to an alternative beneficiary or by way of residuary disposition.

Special Report at 13-14 (citations omitted). The Commission did not mention the anti-lapse statute as a potential method of fulfilling this provision.

When it enacted our slayer statute, the General Assembly "profited greatly from" a model statute drafted by Professor John W. Wade. Special Report at ii. Professor Wade expressed the sentiment that a slayer statute should expressly exclude the application of an anti-lapse statute to prevent the injustice which results from a person taking through a slayer who is not himself an heir of the deceased testator.[1] Wade, *Acquisition of Property by Willfully Killing Another—A Statutory Solution*, 49 Harv. L. Rev. 715, 727 (1936). Although the North Carolina legislature declined to adopt a provision expressly excluding application of the anti-lapse statute, it used another route designed to achieve the same result. That approach involved passing property bequeathed to the slayer as if the testator had died intestate with respect to it, thereby avoiding a lapse of the gift. This provision,

---

1. Professor Wade expressed this concern by wording his model act to bar not only the slayer but also "any person claiming through him. . . ." Wade, Acquisition of Property by Willfully Killing Another—A Statutory Solution, 49 Harv. L. Rev. 715, 724 (1936).

"should prevent possible application of an anti-lapse statute giving the decedent's property to a person not his heir—for example to issue of decedent's slayer-spouse." Bolich, *supra*, at 198.[2] Professor Wade had recognized this potential approach to preventing the operation of an anti-lapse statute.

> The anti-lapse statute might also have been avoided by providing that the property would pass as if the decedent had died intestate thereto, but this provision would probably not reach a satisfactory result if the will named an alternative or residuary devisee or legatee or if the slayer were named to take jointly with another person or as a member of a class.

Wade, *supra*, at 727. To avoid the unsatisfactory result of *automatically* passing the property by intestacy, *i.e.*, ignoring testator's intent to provide for an alternative beneficiary by way, for example, of an alternate residuary clause, joint or class gift, the legislature included in section 31A-4(3) the "unless otherwise disposed of" clause. A testator's alternative disposition will be thereby honored, and, if no alternative disposition is included in the will, the anti-lapse statute is nevertheless avoided by the slayer statute's own, discrete dispository scheme, *i.e.*, passing the property as if with respect to it the testator had died intestate.

The provisions of the statute itself, the applicable canon of statutory construction, the legislative history behind it, and the inclusion of a provision giving it exclusive application compel the conclusion that the slayer statute operates independently of and to the exclusion of the anti-lapse statute. Accordingly, section 31A-4(3) alone should control the disposition of slayer's share under testator's will.

Under section 31A-4(3) as applied to the facts here, the slayer's share—one-eighth of testator's residuary estate—should be distributed "as if the decedent had died intestate with respect thereto." N.C.G.S. § 31A-4(3). Under our intestacy laws, N.C.G.S. § 29-16(a)(1) and (2), John's two children (testator's grandchildren) should each take one-sixteenth share of John's one-eighth portion

---

2. This result would have been possible under the anti-lapse statutes as they existed when the slayer statute was enacted. *See* N.C.G.S. §§ 37-42 to -42.2 (Supp. 1959) (now revised).

of the residuary estate. Testator's seven other children should each take one-eighth of John's one-eighth share.

Finally I have no doubt that it is proper for John's children to share in what would have been John's portion of the estate. The slayer statute did not go so far as to exclude innocent persons who might otherwise take even though they were descendants of the slayer. *See Estate of Wolyniec v. Moe*, 94 N.J. Super. 43, 46, 226 A. 2d 743, 744-45 (1967) (holding it unconscionable to penalize an unborn child for the crime of his mother); *Bates v. Wilson*, 313 Ky. 572, 574, 232 S.W. 2d 837, 838 (1950) (expressing the notion that the legislature did not intend to penalize an innocent child for the acts of her father in killing deceased); Restatement of Restitution § 187 comment h at 768 (1937) ("the fact that the persons who would have been heirs . . . are the children of the murderer will not preclude them [from taking], if they would have inherited the property from the decedent if the murderer had predeceased him"). Under our slayer statute, John's children should take not by virtue of their relation to John, but by virtue of their relation to the testator.

Since the slayer statute permits John's children to take not as John's heirs but as heirs of the testator, I see no constitutional problem with enforcing the slayer statute as written. The majority's footnote on "corruption of the blood," "bills of attainder," and the slayer statute's constitutionality lacks depth. I fear the majority has violated Pope's admonition that "A little learning is a dangerous thing; Drink deep, or taste not the Pierian spring." Pope, A., *An Essay on Criticism*. The majority has not demonstrated that these doctrines have anything to do with the slayer statute.

The leading scholarly article on slayer statutes by Professor Wade, already cited above (to which then Harvard Law School Professor, later Dean, Erwin N. Griswold, made "numerous valuable suggestions," see acknowledgment, 49 Harv. L. Rev. at 752), suggests that such statutes provide that "heirs or next of kin of the slayer may claim the property if they are entitled to it in their own right, but they cannot claim through an ancestor who has disqualified himself by his wrong." 49 Harv. L. Rev. at 727. As to the constitutionality of such statutes, Professor Wade notes:

Objections to its constitutionality would be based mainly upon the provisions in most state constitutions forbidding forfeiture of estates or corruption of blood as the result of a conviction. Under these provisions it would normally be held unconstitutional to take away from the slayer any property interest which he already owns. For this reason many of the decisions adopting the view that title passes to the slayer give as an added reason that any other holding would constitute a forfeiture of estate. There may be substance to the argument when the statute law of the state provides that the property shall descend to the slayer and the court engrafts an exception. But even then it would appear that the proper rule is that there is no forfeiture of estate. The court is not taking away from the slayer an estate which he has already acquired, but 'is simply preventing him from acquiring property in an unauthorized and unlawful way, *i.e.*, by murder. It takes nothing from him but simply says you cannot acquire property in this way.' And if this course may be taken by a court, obviously the legislature may provide that property cannot be *acquired* through a wilful and unlawful slaying.

It is significant that although statutes bearing upon one or more branches of the general problem have been enacted in almost half of the states, no one of them has ever been held unconstitutional. The constitutionality of a statute has been directly attacked in only one case, in which it was easily upheld [*Hamblin v. Marchant*, 103 Kan. 508, 175 Pac. 678 (1918), *aff'd on rehearing*, 104 Kan. 689, 180 Pac. 811 (1919)]; but there are numerous cases in which its constitutionality was tacitly assumed.

The argument that the statute would work corruption of blood is hardly deserving of comment, since it does not prevent heirs of the slayer from inheriting from him property which he already owns, but merely keeps him from acquiring property in an illegal way. Furthermore, unless property is taken away from the slayer as a result of his crime, it seems impossible to say that the due process of law clause is violated. The conclusion is, therefore, that so long as a statute prevents merely the acquisition of property by an unlawful killing, it is constitutional.

49 Harv. L. Rev. at 720-21 (footnotes omitted). Likewise Professor Bolich, in his earlier cited article, has written:

> Fundamental to this area of law which seeks to prevent a killer from profiting by his crime is the distinction between taking a slayer's property because of his crime, and preventing him from so acquiring property. Whereas a slayer may not be deprived of his property because of his crime, he may be constitutionally prevented by statute from acquiring property thereby. Thus, this statute, which prevents unjust enrichment by providing that a slayer shall not thereby inherit from his victim or take by his will, takes nothing already owned but constitutionally prevents a wrongful acquisition. Its provision that such property when not otherwise willed by the decedent, shall pass to his other heirs next in succession prevents 'corruption of the blood' because the slayer's issue will generally take in their own right by representation of their 'deceased' parent the share he would have taken. And by specifying that he is deemed to have died immediately prior to the decedent it fixes a date of 'death.'

40 N.C. L. Rev. at 199-200 (footnotes omitted).

Our slayer statute does precisely this. It prevents the slayer from ever *acquiring* his testamentary share. Therefore, there can be no constitutional prohibition on preventing the slayer's children from acquiring that which their parent never acquired. They acquire only that to which they are entitled as heirs of the testator. They take the *intestate* share of the slayer by representation of the slayer as heirs of the testator, not the slayer. In this case the slayer's intestate share is one-eighth of his bequest to which his two children are jointly entitled.

Neither would I want to second-guess, as does the majority, the wisdom of Euripides, Shakespeare, and Holy Scripture on whether we should "visit the sins of the father upon the children." I am confident that it is within the legislature's prerogative to provide, as it has done, that when a legatee slays the testator, the legatee's share shall be distributed on the basis of the beneficiaries' relationship to the testator, not the slayer. There is indeed wisdom in this provision. For if the *slayer's* heirs are to take his *testate* share, this provides still another motive for slaying the testator. The majority apparently is unwilling to

allow the legislature to make such a determination; instead, it substitutes its own judgment for what ought to happen to the testamentary share of a legatee who slays the testator. The question, I believe, is best left to the legislature.

Justice MEYER joins in this dissenting opinion.